SARAH F. MOUNT

*v.*

JOHN ADDISON CHAMBERLIN et al.

[Submitted May 7th, 1915.    Decided July 20th, 1915.]

1. Where a husband, who was indebted, made deposits in the name of his wife, and on her death she left her property to him in the form of a spendthrift trust, he has the burden, as against his creditors, of proving his defence that such moneys were not his, but belonged to the wife.

2. In a suit by a husband's creditors to establish their claims in property devised and bequeathed to him by his wife, which had been acquired with moneys deposited by the husband in the name of his wife, evidence *Held* to show that the moneys belonged to the husband.

*Mr. Aaron V. Dawes,* for the complainant.

*Mr. Richard M. J. Smith,* for the defendants.

BACKES, V. C.

This is a creditor's bill to recover equitable assets. Lavinia Chamberlin, the wife of the judgment debtor, John Addison Chamberlin, died in 1910, leaving an estate of less than twenty thousand dollars, which by her will she gave

"To my said husband, John A. Chamberlin, and Howard Dehoney, of the City of Philadelphia, Physician and their heirs in trust to collect the rents and income, pay all proper and all necessary charges and expenses, and to pay the net income thereof to my said husband, for and during the term of his natural life, yet so nevertheless that the said principal and the income thereof shall be clear and free of all his debts and engagements both present and future and without liability to attachment or execution process of any kind by his creditors and shall not pass by any assignment in insolvency or by virtue of any Act of Bankruptcy."

At the death of Chamberlin the estate is to go to his appointees by will. Upon failure to appoint, the net income is to go to his mother for life and thereafter one-half to a nephew for life, who is to be succeeded by his children absolutely, and the remaining half to relatives mentioned. The estate, or at least sufficient to pay the complainant her judgments, it is charged, was created out of the earnings of Chamberlin while he owed the complainant, and the bill seeks to reach these assets. Chamberlin failed in business in Hightstown in the fall of 1887. In 1893 he left Hightstown for Asbury Park and the following year went to Philadelphia and remained until 1902, during which period he made and accumulated considerable money as a tract and book agent. Of this he made deposits in the name of his wife in the First National Bank of Hightstown and the Farmers' National Bank of Allentown, N. J., by checks of his employers made out to him and endorsed to his wife, aggregating $6,824.03. The deposits were made by mail and were accompanied by letters of advice from Chamberlin, many of which are before me. These moneys were invested in bonds and mortgages in the name of the wife and in building houses upon lands, the title to which stood in her name. The estate must respond to the complainant unless the defence is made out that the checks so deposited belonged to Mrs. Chamberlin, and the burthen of this is on the defendants. The defence is supported by the testimony of Chamberlin only. He says he went to Philadelphia penniless. During the first two years his business was not a success, and he borrowed $2,000 from his wife to carry him through. The next three years he was employed by another concern, where he made considerable money. The following year, with another company, he made none, but the succeeding two years he made some, when his

health broke down and he returned to Hightstown and retired. The $2,000 he says he paid back by sending, from time to time, deposits to the banks to the credit of his wife equal to that sum, and that the remaining checks were cashed by her and forwarded by him to the banks as her agent. He characterized her as his banker. He asserts that when they went to Philadelphia she had $7,000 in a bag or bags sewed on the inside of her dress, which she used to finance him. Three thousand dollars of this he claims she received from relatives of the family as wedding gifts when they were married in 1879, which for fourteen years she kept about the house because she distrusted banks. One thousand dollars she received from the sale of a trust bond given to her by her husband's mother, who, if she gave it, was left absolutely penniless; and the remaining $3,000 was derived from the sales of building lots, buildings, machinery and household furniture. The money was thus carried around for years, he declares. That's the story. Let us analyze and reflect and then digest it, if possible. Mrs. Chamberlin, according to her husband's statement, was trim of figure and neat in dress, and if she carried the bags of money on her person she must have had a very clever dressmaker to preserve symmetrical proportions, or else there was an occasional bulge, for the hoop skirt or the "Grecian bend" and the bustle were not then in vogue. In May of 1892, when Mrs. Chamberlin was supposed to have $3,000 in the house, she opened a bank account with the First National Bank of Hightstown with a deposit of $250. The deposits thereafter were all small until she sold the canning factory building, of which mention is hereafter made, for $500, which she deposited in April, 1893. By that time she evidently had been weaned over to the banks, and the thought suggests itself—if she had the $3,000 in the house, why weren't they deposited or invested? The first year she opened the bank account she had two notes, one for $10.74 and another for $100, discounted. Is it likely that she would borrow money and pay interest when she had ready cash on hand? As Chamberlin prospered, his wife's bank account fattened. Investments upon bonds and mortgages were made out of the deposits from time to time as the bank balances would warrant. What, curiosity prompts one to ask, caused Mrs.

Chamberlin to change her financial methods about this time and seek investments for her money, when, as we are told, up until the time she took the $7,000 to Philadelphia, she was so fearsome of banking institutions and all forms of securities that she preferred to forego the increments rather than hazard the principal? During the time we are asked to believe she carried this large sum of money, she had outstanding mortgages on real estate in her name, the interest of which she paid. It also troubles me to understand why Chamberlin didn't cash the checks, which he says his wife cashed, at the local banks on which they were drawn. It would have been much easier and convenient for him and less troublesome to his wife. And it seemed that when Mrs. Chamberlin finally got her nerves under control and her trust in banks firmly established, her husband suddenly went bank shy. He feared his creditors, and for that reason, we are informed, he had his wife act as his "banker," and his accumulations of $4,000 which he says he brought back to Hightstown in 1902 when he retired from business, he kept in a grip in the house until it was spent. The most remarkable thing about this tale is that it should ever have been told in the expectation that it would be accepted and believed. But I suppose it is the best that could be invented under the circumstances. It is weighed down by fiction and falsehoods, and is crushed by its inherent improbability and absurdity, and must be rejected. This is not a case of "hiding behind a woman's skirts," but truly one of hiding within.

I have not the slightest doubt that the will of Lavinia was the handiwork of Chamberlin. It was executed when he was at the height of his prosperity, while his wife was in good health, and was obviously drafted to protect him against his creditors.

The bill also charges that certain lands in Hightstown standing in the name of Mrs. Chamberlin were held in trust by her for her husband, and prays that it be so declared. It is not necessary to pass upon this issue, because enough may be recovered to pay the complainant out of the funds already discovered. But the transaction is of interest as showing Chamberlin's general scheme to evade his creditors, of which the money transactions above related are only a part. Chamberlin and one

Hutchinson were engaged as partners in conducting a hay press and canning factory. A disastrous fire caused their failure in 1887. His mother held a mortgage of $3,500 on his homestead and land on which the canning factory stood. The firm also owed her $2,000. Upon a confessed judgment all of the personal property, and under foreclosure of the mortgage all the real property, was sold and bought in by the mother. She then borrowed on mortgage $3,500, and gave another of $1,750 to the First National Bank of Hightstown in substitution of one of a like amount, which had been barred by her suit. The mother carried on the canning business for one year but lost money and made a failure of the undertaking, and, in the language of the answer:

"Owing to her failure in the canning undertaking and the loss of much money thereby, the old lady, Phoebe A. Chamberlin, became despondent and disgusted, and sought to get rid of the whole property, both real and personal; the wife of this defendant, Lavinia Chamberlin, being a young woman of about thirty years of age it was to her that the old lady went with her troubles and offered to give her title to everything if she would assume the claims against them and take care of her in her declining years."

Claims against the property were the two mortgages, $3,500 and $1,750.

"The wife had some money but she did not wish to take any chances; she was afraid of everything and everybody. She was high spirited and a proud person and felt the failure of her husband keenly. She averred she would not take the property, no one should have her money, not even the banks, and that she would move away from Hightstown. In time, however, probably through the persuasion of Attorney Schanck, she was induced to accept the transfer of all the personal and real property from Phoebe A. Chamberlin, which took place on September 16th, 1889."

This old lady accordingly, as her son relates, not only passed over this valuable property but also gave to her daughter-in-law the furniture she received under her exemption from her husband's estate and a $1,000 trust bond, which was converted into money, and formed part of the $7,000 secreted by the wife upon her person. To make the $7,000 story hold together, Chamberlin had to actually strip his mother of every penny she had and leave her homeless and dependent for the rest of her life. Im-

mediately after getting title to the homestead property, Chamberlin's wife laid out about twenty acres into building lots, and at a public sale realized $6,500, which after paying off the bank mortgage of $1,750 and $2,000 of the $3,500 mortgage and all expenses, netted her $1,100, and this sum fitted to a nicety in rounding out the $7,000 "bag money." Upon the remaining land of the homestead property Mrs. Chamberlin afterwards, in 1899 and 1904, built two houses costing $1,400 and $2,000 respectively—sums obtained from the fund created by Chamberlin. The homestead is a part of the estate left by Lavinia. This history comes from the mouth of Chamberlin, and it is as unworthy of credit as his testimony with reference to his savings is unbelievable. It is pregnant with cunning contrivance and artful manœuvring to circumvent creditors, and the wonder is that it was not long ago uncovered. Laches is not set up as a defence and probably could not have been maintained, if pleaded.

The investments of Mrs. Chamberlin's estate, now held by the trustee, made from the deposits of Chamberlin's earnings, consist of $6,400 in mortgages. Upon these the complainant's debts will be impressed, and also on the land to the value of $3,400, the cost of the two houses built with Chamberlin's money, if necessary.

The complainant may have a decree, with costs.